May it please the Court, Francesca Frichero on behalf of John Ahrndt. This is not a case about the Internet. Although involving computers, it is a case concerning a police officer's unauthorized access of a home computer network in order to search that citizen's personal computer for information. Whether this Court follows the United States v. Jones approach of analyzing the problem as one of property rights or whether this Court follows it under the United States, under the Katz v. the United States reasonable expectation of privacy formula, either way, there was a violation of the Fourth Amendment. Well, when you say it doesn't involve the Internet, maybe it would be helpful to the Court if we could understand the technology here. Because when I pop up my iPad, and there's wireless in this courthouse, when I pop up, there will be wireless Wi-Fi routers within this courthouse which will have locks on them, which means they are password protected. If I sit in my house and my neighbor has a Wi-Fi, I've got a Wi-Fi, he's got a Wi-Fi, it will show me as a function of just accessing my Wi-Fi router that there are other Wi-Fi signals that I can piggyback on if they weren't password protected. So that's the in-home device that creates the window, if you will, the open window, or whatever, into your client's house. Now what he then, as I understand it, did, he subscribed to LimeWire, which by its definition and purpose is a sharing mechanism so that people who are connected through LimeWire can access his files, music, pictures, videos, or whatever, to the extent that he provides them the connection to his LimeWire account. And that would be helpful to know exactly how that works. And then the third feature that appears to be in this case is the iTunes, which J.H. had. She accessed his Wi-Fi, piggybacked on his Wi-Fi. Her connectivity apparently was through iTunes. It's not clear to me whether Mr. Arndt had the iTunes connectivity or even knew that LimeWire had a connectivity with iTunes. But in any event, once she got piggybacked on his Wi-Fi, she was through iTunes enabled to apparently access his LimeWire connection. Now what bothers me about this case in analyzing it is that LimeWire by its nature is a sharing, file sharing device. And so the question is, if you are in a posture where you are by definition using something that is a sharing device, whether it's a trespass analogy or it's a reasonable expectation of privacy, where are the boundaries? We're dealing with this technological ability to tap into somebody's computer, physically located in the house for sure, but the technology is presenting us with a situation where it's not clear, as the district court was analogizing to, are you in effect, by getting into file sharing, opening up your house or putting your computer files out on the street corner for anybody to pick up? So that would be helpful if you could help us on the technological side as well as the legal side. Certainly. First, there's no evidence in this case that Mr. Arndt was using LimeWire in any way. There was no LimeWire program, no evidence of any such program introduced into evidence. There was a file that had that name in it and Mr. Arndt's admission to officers that years previously, he had used LimeWire, but there was no evidence at all in the record that he was using LimeWire at the time. And the question is, how could that possibly be? Are you suggesting, then, that he may be factually innocent because she was picking up a LimeWire share from somebody else? No. She was certainly picking up the folder on Mr. Arndt's computer that was identified as Dad's LimeWire tunes. In the record, the Court will see that Robert Young's testimony explained that on my redirect examination. You can have a file on your computer that has the name of some program without then running that program. It can be a leftover. It can be sent to you in some other fashion. But there is no evidence in this case that he was using LimeWire, none at all. And there's no debate about where that file was. It was indeed on Mr. Arndt's home computer. But as a media-enabled file, such as MP3 files, LimeWire files, and other shared iTunes files, it was capable of being picked up by the neighbor's iTunes program. In other words, iTunes, when it's working, will pick up on whatever network it's connected to any computer files that are susceptible to being shared. Okay. Now, when you say susceptible to being shared, does this mean that Arndt at some time in the past may have used LimeWire? Yes. That's what he admitted to agents. Okay. But not – okay. But if he at some time in the past had used LimeWire, was this file then created using LimeWire? There's no information about whether that was created using LimeWire or whether it was sent in some other fashion or – Does LimeWire have a default sort of a share provision? That is, we assume that LimeWire, if you download LimeWire, that these files are available for sharing? Or is there something that Arndt would have had to have switched or used when he used LimeWire in the past? In the record, I believe the testimony about LimeWire is that it, too, requires you to share. But its default setting is on sharing, isn't it? I believe in LimeWire it is, but I think where you keep your folders may matter. But as I was saying, because this was – there was no evidence of any LimeWire program before the district court, this wasn't something fleshed out any more than that, except that there was a media-enabled file on Mr. Arndt's computer. Now, the – I want to make sure I understand, counsel. So you're telling us that there's no evidence that he had LimeWire sort of currently on his program? Correct. But you do admit that he had LimeWire at some point in the past? At some point in the past, yes. He admitted using LimeWire, whether it's even on the computer we were talking about or some other computer, I don't know. That's in his statement. Obviously, I mean, sort of infer that there was a file that was in some way relying on LimeWire because it was – it was allowing itself to be picked up by J.H.'s iTunes account. Presumably so, but how that got to Mr. Arndt's computer is a matter of pure speculation. How what got to his computer? The file. You could send me a file that is called that in any fashion you'd like, and I could put it on my computer. There's no evidence that it came from a LimeWire program when it – in terms of Mr. Arndt's use of that program. When you say it's media-enabled, what do you mean? Files that are like JPEGs and audio files, the MP3 player files for music, and iTunes shared files. Those are media – they are called media-enabled, meaning that computers recognize them as being media and not just text, for example, or something else. And is there anything inherent in those that one should be aware of, that if they're on your computer, that a program such as iTunes, if you – if somebody gets access to your iPad, even in this building, and see these networks, I'd like to emphasize that we are talking about February of 2007. The iPad didn't exist then. The iPhone didn't exist then. iPods did. iTunes was just – had gotten started a few years previously.  The iPod didn't exist then. But this universe has rapidly developed, and I think our understanding along with it. At the time, what we have in the record is simply a person who had a home wireless network, no use of the Internet, and a file on there that could be picked up by someone else's iTunes program. There is no evidence whatsoever that he was ever warned that that router would mean someone else could do that. Even in your example, Judge Fisher, when – if you see all those networks, you may indeed piggyback in order to get an Internet connection. But piggybacking to go out to the Internet is not the same as using that signal to then intrude into the computer that is connected to the network. In other words, and this gets into – it's talking about the difference between a trespass and a trespass with the intent to get information, piggybacking is the trespass that lets you get out to the Internet, perhaps the shortcut across someone's yard. I don't think there's common understanding that that same wireless networking can permit you to then actually go into the other person's computer to see a file. Now, I assume that had Mr. Arndt wanted to and taken steps to do so, he could have put a password on this and had this been password protected. Is that right? Presumably he could have, but there was no evidence of either an owner's manual or his even having purchased this router when new. Well, no, there was evidence that there was a manual to his router. Not to his router, no. The government introduced the owner's manual that came with some models of the 54G, the Belkin 54G. It was not seized from Mr. Arndt's home. There was no CD. So you're contending we have to assume that he had no manual? Yes. He had the router. Okay. And where that came from was not in evidence. Does it matter for purposes of our analysis how sophisticated an individual computer owner is? For example, does it matter to us for purposes of this case how sophisticated about computers Mr. Arndt was? In a particular case, I believe it could. But still without ---- Does it matter in this case? In this case, no, I don't think it does, because his extent of sophistication would not show that he knew that anyone could get into his computer in this fashion. What do we know in this case about Mr. Arndt's sophistication about computers? He did work in the computer industry, but not as a professional person. He worked selling computers, computer parts, and he said to the agents when interviewed that he had used that router and he was familiar with terms like thumb drives and hard drives and things like that. But there was no discussion with him about who installed the programs on his computer or anything else that showed a particular expertise. If the evidence were to show, if it doesn't now, if it were to show that he did actually use LimeWire and that he did understand and indeed the purpose of LimeWire was to file share, so that he knew that once he was active on LimeWire, users of LimeWire, whether he knew them or who they were or not, could have access to files stored on his computer, what's the posture of privacy expectations trespass under that scenario? And may I answer and save a little bit of time in rebuttal? This is a difficult case, and just to answer the question, we'll make sure that both sides get enough time to say what they need to say. Thank you. So don't worry too much about time. If Mr. Arndt at some point in the past had a LimeWire program on the computer that was then searched by the neighbor, but then no longer had the LimeWire program on his computer. I was talking, just to say, you know, if he had LimeWire, don't get too qualified. I'm not trying to pin you down and make you concede anything. I just want to know if he had LimeWire and knew and that the characteristics of LimeWire were, once he enabled it, that he would be giving access, accessibility to media-enabled files on his computer. How would that affect your arguments on privacy, either under Jones or under reasonable expectations? Then it would be Ganon. Then it would be this Court's case in Ganon. Because if he's using LimeWire and his files are being shared over the Internet with anyone else across the Internet who's using LimeWire, then I believe you would have the exact same situation you had in Ganon. But that's why our argument here of it being so different. In Ganon, there was evidence before the Court that that person had actually installed LimeWire, that he knew how it worked, that he was using it to share files over the Internet. None of that evidence exists in this case. Yeah, nothing in this case shows that he was using the Internet or that J.H. was using the Internet in the exchange that took place. That's correct. He was capable, I assume, of getting the Internet, as was J.H., but that's not the interchange that took place. That's correct. Okay. Why don't we hear from the government, and we'll make sure you get a chance to respond. Thank you. Good morning, Your Honors. Counsel. May it please the Court. Greg Niasse for the United States. I think at the outset it's very important to distinguish some of the mediums during which we're being used here which occasioned the exchange of information between J.H. and Mr. Arendt. Could you keep your voice up, please? I'm sorry. That's all right. Thank you. We have several mediums here. The first is the Internet, which everybody's aware of with their iPads and the connectivity here in the courthouse. Take that out. There was no information exchange over the Internet. LimeWire. LimeWire is a file-sharing program designed to exchange files over a network which is distributed amongst a number of individuals and which has default settings set to share and designates a specific file folder for that sharing. That's the software that was addressed in Gano. Software was also addressed by Agent Cole and distinguished from this instance in which we have iTunes over which the information was exchanged. J.H. had a wireless computer, and as such, her computer jumped from her own network, which was a Linksys, to Defendant's network, which was identified as Belkin 54G. Operating on that network was iTunes. When her iTunes library opened up, it noted that there was a shared file identified as Daddy's LimeWire Tunes, which is where I think some of the confusion comes from. Mr. Arendt did tell Agent Cole, and you can find this at ER202, that he used LimeWire as recently as eight months ago, but deleted all of the images. So LimeWire, to the extent that it plays a role in this case, is only in name, as far as the file is concerned. The limited and very narrow inquiry for us, therefore, is whether the defendant had an expectation of privacy which was both objective and subjective in his open and unsecured wireless network and the content. Now, you say open. I understand unsecured. What do you mean by open? It was a synonym for unsecured, Your Honor. And whether the expectation of privacy runs to the content on that network. Now, the network is formed by the router. Content on that network with respect to someone who is outside the house, accessing that network without his knowledge. That's correct. Okay. Whether it's iTunes, because of its nature. Before you move to iTunes, I just want to make sure I understand. So if I'm in my house and I've got a neighbor next door and we both have wireless devices which enable things within the house that have a purpose, and that's why you have wireless, and you also use the wireless, then, as for a device that will connect to the Internet or will enable you to file share whatever, are you suggesting that for purposes of this case we're looking at this as his being within a network range of somebody else who had a wireless router? Is that the network? Or what's the network? You said if we take the Internet out of it, how does the network file share on the authorized side of the equation as opposed to and then how do you extend it to the unauthorized? Several parts to that, Your Honor. First, I think that the word network, as I use it here, is for two computers to link together. And that is facilitated by the settings on the defendant's router. It's clear that the defendant plugged it in and simply let it go, in spite of the fact that he had access to a disk which comes in the box, as testified to by Agent Onstad, with a 109-page detailed explanation of how the router works. We just heard from them that there's no evidence of a manual. We found no manual at the defendant's house. And where's the disk come in? Because that sounds like the equivalent of a manual. The manual was on the disk. The Agent Onstad... So help me out here. This is just a factual inquiry. Do we have evidence from which we know that he had either a physical manual that you turned the pages of or a disk that was the equivalent of a manual for the instructions? No. So what's the disk that you're talking about? The disk I'm talking about, Your Honor, came from Agent Onstad's testimony. Agent Onstad went out and purchased a Belkin 54G for purposes of... Oh, I see. So he got one, but we don't know for sure whether Mr. Arndt had one. He might have, but we don't know for sure. Do we know whether Arndt purchased this system or where he purchased it? The system was purchased from a gentleman by the name of Chalmers, who used the word daddy in some of his file structure. And the wireless system was purchased? We don't know where the router came from, Your Honor. Okay, so we don't know whether Arndt purchased the router used or new. That's correct. Okay, so when you say he got the system, you're talking about his computer or you're talking about his wireless system? Computer. His computer. Okay, well, that's different. I just want to know about the router. We don't know where the router came from, Your Honor. Okay. With respect to iTunes, however, it's important to note that the default... You haven't answered my question. My question is still, what's the network? The network is... When he opened up Belkin without its password protection, what network was he establishing? He established a network with his cohabitants, Your Honor. There was a gentleman that lived above the garage. It was just to be within the house that he... It was for purposes of within his own dwelling. Well, we don't know what the purpose was, as the defendant offered no statements or declarations, but it's safe to say, yes. The network. That's the network. Okay, and you're not suggesting... If I put a wireless router in my house, I'm creating a network of the range of that router. To anyone within connectivity, yes. So that is the network. The network would be constituted by the use of your computer, the router, which would broadcast the wireless access point or the signal, and any adjoining computers, which were either authorized by password protection, or if there was no authorization required, they could simply jump on the network. Okay. And it has nothing to do with the Internet now. It's just what's within reachable range. That's correct. Okay, so if we opened up here in the hotel, you know, 9's across the street, for example, has a Wi-Fi that you can access if you were a guest at the 9's, and they allow you to get on it for free if you're in the public area, and we could open it up here just between what's the router that I... I'm sorry. I don't even need the router here. What I understand, as in her case, her router was down, right? Her router, the signal from her router, the wireless access point, degraded as she moved throughout the house. Right. And her computer was set to jump onto the next strongest signal. Right. And so that's the network she got access to because the modem or the router device within her hardware allowed her to jump onto a proximate wireless signal that would then, in turn, enable her to use it to get access to the Internet. That's correct. Okay, so that's when you say that's the network. So just in terms of what his reasonable expectations were, he set up something for his internal house use. We don't have evidence of that. Okay, let's assume that that's what his purpose was. But because he didn't password protect it, he essentially, in doing it within his house, created an electronic field, if you will, or a digital field or whatever you want to call it, that anybody who could get access to that Ethernet, I know I'm using terms that I don't fully understand, but just conceptually, that now he's got somebody, unbeknownst to him, who is piggybacking on his network. And so it now is as if she's inside his house. Well, actually, Your Honor, not really. If you take the network and the piggybacking stuff out, the defendant had a radio, and he's broadcasting a signal. And over that broadcast, on the signal, is the content from iTunes. And that's simply what the court needs to address, is whether the defendant who could have, based on his experience in the computer world. Now, note that Ms. Frachero says he's kind of a moderate guy, but he's beyond plug and play here. He's a guy who is swapping out hard drives and reconfiguring them, according to statements he gave to the agents. There were nine different hard drives taken here, one machine. You just referred to his iTunes. Is there any evidence that he had iTunes? Ms. Frachero is correct. There is no evidence, and it's very specific. There is no evidence presented at the hearing that the defendant had iTunes. Some of the testimony from the government's witnesses assumed the existence of iTunes on his system. That's correct. And it looks like the district court may have also assumed that. I think, yes, that's correct. I'm not sure that the correct word would be assumption. I think it's a reasonable inference from the facts that were presented at the hearing. What the court, district court. Is it the government's position as well here today that there's a reasonable inference that he had iTunes? That the defendant had iTunes. Yes, that's a correct factual finding. That's a correct factual finding, or that's the government's, that's your assumption? And what's the link that gets us to the point that he had iTunes, and why does it make a difference? Well, it makes a difference because, I'll answer the first question. Agent Cole never said that the defendant did not have iTunes. So what we're dealing with here is the focal point of the hearing was on the defendant's property rights and his interests, not on what was discovered forensically. Secondly, we'll note that the magistrate in this case circumscribed the amount of data and the type of data that could be taken during the search warrant, requiring Agent Cole to return the computers which did not directly have contraband on them. Agent Cole's reports, which are furnished as part of this record at ER 96, indicate specifically that he did not do forensic examinations on the bulk of material that was returned, but merely scanned the computers for images. So to the extent that iTunes was or wasn't there, we don't really know for sure. But what we do know is the defendant's conduct with respect to his own treatment of the files. He tells the agents that he's downloading music, and he's also downloading other images, having once used LimeWire. Secondly, there is a file path that's designated as one of the child pornography files, which shows in its path the term music. And thirdly, the defendant admitted to using his computer to download music and other such files. So what the district court had before. But he could have done that without using iTunes. He could have done that without using iTunes, yes. I thought the district court placed heavy emphasis that in the iTunes mode, he had to affirmatively take action to create accessibility, file sharing capability, so that that was relied on heavily by the district court to say he had no expectation of privacy. He affirmatively chose to enable it through his iTunes account. Now you're saying, well, we're just inferring that he had iTunes. Well, I think the district court's finding is a correct inference from the record and the way it was treated by all the parties during the time. You know, I read the testimony, and the word affirmative, in a sense, was greatly qualified. To me, it seems the most that the record shows is that he has a system coming out of it that's set up with his router that allows access. I don't think it's a supported inference in the record to say that he affirmatively, in the sense of intended, to allow people outside the house to have access. It's set up in such a fashion that people outside the house do have access, but that he affirmatively took steps in order to make that happen, I do not think is established by the record. Even still, Your Honor, the objective test would render his intent with respect to who he wanted to share iTunes with irrelevant for purposes of determining privacy. So let me go through this in a slightly different way, to just go through the narrative of what happens. J.H., using her computer, is connected to his network when the link to her own router deteriorates. She then sees in his network these files that have very strongly suggestive names. She then calls the police. The police show up, and the officer directs her to open one of the files, which she has not previously done. She opens one of the files, and there is now picture evidence of what the labels suggested would be found, that is to say, we find child pornography, after she's opened the file at the direction of the officer. Now, I'm willing to assume that if this had happened in exactly the same way, except when the officer shows up, she shows him what she's found, basically silver platter doctrine. If the officer had then said, you know, this is very interesting, I'm going to take this and what other information I can gather about who this person might be and so on, he could have gotten a warrant. I think there's enough there to get a warrant. But he didn't. He asks her to open the file, which she does at his direction. I take the fact that she is acting at his direction and opening the file, that that means that that's his action. My question is, even though it was not password protected, it's clear that an affirmative action was taken by the officer in opening up something that was closed. Now, sometimes my door is unlocked in my house. Does the fact that the door is unlocked in my house mean that the officer can open the door and walk in? I don't think so. I recognize that physical analogies are treacherous with respect to computers. That's in a sense where the court's on this knife edge in Jones. OK, how much is this sort of physical trespass analogy helpful and how much not? But it seems to me that even if he had no reasonable expectation that someone within 100 feet, 200 feet of his house wouldn't know, because I'm giving you that for the purpose of this question, does that mean that someone who sees the file gets to open it up if he is a police officer? I believe under these circumstances and the circumstances that you describe, which factually I take it. I tried to describe this case. Factually, I take issue with the characterization that the network was closed. Well, I didn't say it was closed. I said the network allows access to people within a certain distance of the house. I didn't use the word open or closed. All right. What the government's position here is that J.H. and the deputy, when they were looking at the shared content on the iTunes files, saw a hyperlink to a file. They didn't know where it was. What that basically was is to borrow the analogy. Wait a minute. They had to know that it was close by. I mean, everybody knows how that works. She's picking it up from a nearby place. She even pointed at the house. Well, she suspected it was from the house. Right. And it's clearly not coming from downtown Portland. That's absolutely true. It's got to be coming from someplace that's sufficiently close that it's going to show up on her computer. I don't know how many houses were nearby, but I understand this is a development. There are not very many houses. So they knew it was coming from a nearby structure. They knew it was coming from within at least a 400, probably 150-foot radius. Well, I'm not sure they knew that. We learned later that that's the radius of this device. Correct. J.H. does point to the house across the street as one with toys in the yard, drapes closed, and she suspects that's it. So getting back to Your Honor's question, what we have here is, to borrow the analogy from Gano, and from Boro, we have an individual who has a radio broadcast, the content of which is being put out over that radio broadcast. The privacy interests in that are such that, in Gano, the drapes were open. It's not an open door. There's no trespass that occurred here, and there's no implication with Jones, as Jones announced a new rule for a tactile trespass action. The broadcast essentially took the file box as described by the district court, put it on a card table out in front of the defendant's home, and posted a sign on it that says, Take a look. The invitation to click. Wait a minute. You're saying that that's what happened here? The sign says, Take a look? Well, that's the district court's analogy. There is no sign. I mean, is that your analogy? The fact that she sees these files and has to click on them, the fact that she sees the files, there's an invitation to take a look? I believe, Your Honor, that given the fact that the iTunes is sharing, it's set to share. There is a hyperlink that – Wait a minute. Where's the iTunes setting? Her iTunes. Her iTunes. Her iTunes screen on her computer shows the content availability of his material, the content of his pictures. By clicking on the library, she opens up the content of the library and is able to see, for example, the spines of the books that would be in the library. So she's got a key. Let's work with your analogy. The broadcast is, in effect, saying, Okay, I have these photo files, and by broadcasting I'm putting them outside the house so to access them you don't have to come into my house, and they're sitting in the middle of the street, so they're not on my property anymore. Okay, and she's across the street, and she has the ability to unlock or access what's sitting in the middle of the street because she has a device, iTunes, that is able to pick up a media-enabled file like that. So we have to assume, do we not, that he has deliberately put it outside the house with some knowledge that by it going outside the house somebody is able to come along and pick it up. This is somebody could do if they saw a carton of dirty pictures out in the middle of the street. I think that the defendant takes the risk that someone will do that and thereby abandons his subjective and objective privacy interests in the content of those materials. And just so I understand, he made that happen because he did not password protect his radio signal. That's correct. Okay, so that's the only thing he did. He didn't do anything else other than fail to protect his router signal to enable his neighbor to get access to his file. The district court did seem to suggest that he did. We believe, Your Honor, that the district court correctly found that the defendant configured iTunes to share on that unsecured wireless network. How can he make that finding if nobody has seen iTunes on his computer, though? I think it's a reasonable inference, Your Honor. I think why? Well, couldn't she have, couldn't her iTunes have linked to his LimeWire without him ever having iTunes? And this is the question I think I asked earlier. Why does it matter? Does it matter whether he had iTunes or not? Well, to back up, LimeWire isn't going to connect with the iTunes program. The iTunes is only going to talk to the other iTunes programs. So the fact that there is a LimeWire file or it's just simply named LimeWire. Now, that's, okay. Now I'm really confused, counsel. I'm looking at page 12 of the district court's opinion. I'm looking at footnote 2. And the district court found LimeWire has the capability to integrate with iTunes and automatically places all downloaded material in a LimeWire play tunes, playlist. Page, I'm sorry? Page 12 of the district court's opinion, footnote 2. Yes. So that suggests that LimeWire can integrate with iTunes without having to have iTunes on the other end. And that is, it appears that you don't, that to have LimeWire talk to iTunes, you don't have to have iTunes on both ends of that, of the system, so to speak. That's not correct. That's not correct. So you have to have iTunes on both sides? iTunes only talks to iTunes. It will. And how do we know that? I read the testimony and so on. I'm not sure that that was specifically stated. You may be right, but how do we know that from the record in this case? In such specifics, Your Honor, I believe that it's something we can take from Agent Cole's testimony. He talked about setting up iTunes computers in his own home on his own network for purposes of this. Yes, but then he says, I don't know anything about LimeWire. He talked about his use of LimeWire as being able to sit at a remote location, reach out, essentially download a target's file from their own hard drive. But the question is not whether iTunes on one computer can communicate with iTunes on another. I take that to be a given. The question is rather, if Mr. Arndt doesn't have iTunes, can G.A.H.'s iTunes access his computer network in the absence of his iTunes? So the fact that iTunes communicates with iTunes, that doesn't answer the question. The answer is no. iTunes cannot use the network to communicate with Mr. Arndt. Whose testimony establishes that? I would look first to Agent Onstad's testimony. I'm looking at Agent Onstad's question. Go to ER-66. And I'm looking at ER-68. So you don't know whether iTunes can pick up other shared folders other than, say, iTunes folders. Answer, no, I can't. That's pretty – that's not an answer that says only – that iTunes can only connect to iTunes. That says he doesn't know whether iTunes – he knows that iTunes can connect to iTunes, but he couldn't tell them whether iTunes could connect to something other than iTunes. ER-66, Your Honor. The Agent Onstad, on his cross-examination, does say that the network isn't going to enable you to get behind any of the software to go to the other files on the network. I'm on page – you're saying page 66? Onstad at 66. I've got page 66. What are you referring to? I think what I'm trying to do is answer two questions at once. Answer the question you think you're answering. Okay. I've long since been out of time. No, no, that's – as I said before, this is a hard case, and we want to do our very best to see if we can get it right. All right. Okay, so you're saying there's something on 66 we should look at. At 66, Agent Onstad is being cross-examined as to the capabilities of the off-site computer, which would be JHS, ability to access any of the files that would be on Mr. Arndt's computer. Okay. And Agent Onstad there specifically says there's a type of file sharing, but it doesn't happen here. Now, could you point me to the specific language on page 66? Can you give us a line? I'm on page 66. I don't see it. What I do see is that he says, well, I'm not very familiar with iTunes, and he repeats it on page 67. Okay. You're not familiar with how iTunes works? Answer no. If I may get to the LimeWire iTunes issue in a minute and answer Your Honor's question here. Point me to the language on page 66. I'm on page 66. Let's start on 65, line 23. Okay. I'm there. Okay. And go to line 13 of 66. Okay. Wait, wait, wait. I'm sorry. Read on 23 and then go to the next page? See, that's what he gets for working on an iPad. It's slower than a page. No, I can see it. I'm file sharing. It takes time. It'll slow the network down. No, I'm here. One page is loading slowly. Beginning on ER 65. I3 is coming out today. That's right. That's what they say. On ER 65 at line 23, Ms. Ferchero says you're saying intentionally sharing out. If I have a home wireless network and have folders on my network that are set to share within the network, are you with me so far? I can share those folders with the family members, that kind of file sharing. If someone gets access to my home wireless network, can they have access to my shared files? Right? No. So the sharing doesn't occur from outside the network, only within the network on designated files according to ONSTAT. Yeah. But the implication, Your Honor, here is that, first, as Ms. Ferchero said, there's no general rummaging around by law enforcement on somebody else's computer. Secondly, with respect to Judge Bybee's question about the iTunes reaching out and sharing somebody else's file folders, I think the reasonable inference from Agent Onstat's testimony is that J.H.'s iTunes is not going to get on to Mr. Orn's network and open up media-enabled files that are behind the router, so to speak. You know, I just don't get this out of this testimony. I reread the testimony this morning to try and figure out how much was established, and he says several times, you know, this is now at the bottom of page 166, okay, if I'm using iTunes within my home, are you familiar with the iTunes program? No, not very much. Are you familiar with any file-sharing program other than iTunes, any marriage-sharing program, LimeWire? Well, LimeWire is a peer-to-peer sharing. Are you familiar with how LimeWire works? Yes. But you're not familiar with how iTunes works? No. So to get out of his testimony. Actually, if he had an iPad, he could go on and say, okay, and so you also don't know whether iTunes can pick up other shared folders other than, say, iTunes folders. No, I can't. Agent Cole does answer that, though. Agent Cole, well, Agent Onstad is the network expert here. Agent Cole, on direct, points you to ER-76 at line 4. Hang on, okay, I'm fast, but I'm not that fast. I'm sorry. Okay. You're telling me I should be looking at page ER-76? ER-76. Okay. Line 4. Yep. Both users would have to enable sharing within the iTunes application. If iTunes, if either user doesn't enable sharing, then they don't see the other person's iTunes. Okay, and. . . Yeah, that still doesn't quite answer the question. That tells us if somebody's trying to get from iTunes to iTunes, that it has to be enabled on at least one end. But it doesn't tell us whether iTunes can connect to LimeWire without having iTunes sort of mediate it. It doesn't tell us whether ARNT has to have iTunes to mediate the connection between JH's iTunes and ARNT's LimeWire. And I'm still not sure why that matters, but it seems to be a point we keep arguing about, but I'm not sure why it matters. Yeah, I'm not sure either, but I'm now on page ER. This is now Cole still. What page? I'm on page ER 84, Agent Cole. And you've just given me testimony where he says, listen, iTunes shares to iTunes, and maybe you have to have iTunes shared with iTunes. With respect to, I'm now beginning on line 20 of page ER 84. This is Cole saying, with respect to LimeWire, he's saying, I'm not, I've not done any research. I think what you're asking is, did I do the same kind, same or kind of the same setup I do with iTunes? Have I done that with a file share program like LimeWire? I have not. So if the question is, if she has iTunes and he's got LimeWire, can she access, in the absence of his having iTunes, I think he says, I don't know, because I've not run that, I've not done that research. That's a fair inference from the record drawer. Yeah. So I'm a little bit still with Judge Bybee. I'm not sure why it matters. But what seems to matter to me is we have a setup, whether he's done it intentionally, which I doubt, given that he's got child porn on his network, or inadvertently, which seems more likely, that she can access just because she's next door. She accesses it entirely innocently. She calls the cops. The cop looks at it, has enough evidence from which I think he could get a warrant if he wanted to do that, and at his direction, she clicks on the file and discovers, sure enough, it's child porn. He has to have an affirmative act to get past what he has been shown. Now, passwords can be gotten past also. Most passwords are actually fairly easily broken. So it's not as though a password makes it impossible. It just makes it more difficult. Now, I can't get past my password, but I can't remember it. So I'm learning a lot today. Passwords is at least, I mean, I've been really reluctant to make analogies, but the password is a little bit like posting on your land, saying, posting, no trespassing. The sign isn't going to stop you from going across the land if you want to, but at least you've got fair warning. Here there isn't. There isn't. It's not password protected. But she still has to take the active sort of the physical act of clicking the mouse on the folder in order to get the folder to open. Yeah. I think the government's position here with respect to her action is when it shows up on her iTunes file folder, because it's affirmatively set to share that way, whatever content it is and whoever did it, that's an invitation. Let me change it. Let's suppose that McCullough had been trolling in the neighborhood. The JH is not a factor in this case at all. Could McCullough have pulled up in front of their houses, opened up his laptop and said, let's see if anybody's got an unsecured wireless network around here. Holy Toledo, here's one. It's a Belkin 54. Let's see if anybody's got anything interesting. I'm going to open up my iTunes. The deputy opens up his iTunes in his car out front at the curb, and bingo, there's dad's line wire on this. Can he open it up and look at it? Any problems here? I do not know. Here's why. Observation doesn't mean trespass, nor does it implicate Fourth Amendment rights. In this particular case, what the deputy is doing, if he's just trolling without JH in the analysis, is simply looking for – he's not doing what lots of teenagers do anyway. It's called war driving. And he picks up a wireless signal and he observes it to be there. And it's emanating from who knows where, and it's unsecured. It's an invitation to use it. It's not an invitation to use. Everybody and his dog knows that when you're piggybacking on somebody else's network, you're misbehaving. Now, you don't get put in jail for it, but it's not admirable behavior. So everybody knows that if I'm piggybacking on my neighbor's Internet or Wi-Fi or whatever, which I confess I have done – now I've got my own router so I don't have to do it – I didn't say I've been invited by my neighbor to do it. My neighbor, by leaving it unprotected, has allowed me to do it. But I'm not – I don't think that was an invitation. Point well taken. I think that the allowance here, because it's being allowed, still doesn't implicate Fourth Amendment rights. What the deputy can observe doesn't necessarily implicate anybody's subjective or objective privacy interests. Okay. By opening up his iTunes file, he does nothing different than a private person would be doing. By opening up the shared library, he does nothing different than what a private person would be doing. It's all shared. In fact, the iTunes is set to share. It's being publicly broadcast by the person who owns the web. And by clicking on the folder that says Dad's LimeWire, he hasn't violated any rights. He does not have to get a warrant for that. That's precisely the question here, and that's the government's position, is that by clicking on Dad's LimeWire Tunes, it's being set and open to share. So he's able to click on that. It's on his machine, and under Gano and Borowie, it's no different than the privacy interests that were implicated in that particular setting. We've taken you well over time. Yes, you have. Why don't we have the rebuttal? Thank you very much. Thank you. I don't know. Let's start with two minutes and be optimistic. It's a response to a couple of the points. Okay. First, Judge Biby, you asked about the district court's footnote 2. We did point out in our brief that what the court was speaking about there was something that was not none of that information had been introduced in the record. So that was added in the district court's opinion, but is not in the record. The other thing is that, Judge Fletcher, you asked my colleague whether it mattered if some router was open and unsecured, and I think that it does matter. There was testimony in this record that the router, the Belkin 54G, was open. That talked about the condition in which it arrives from the shop. In other words, there are some routers where a person has to take an affirmative step to get rid of security. Those are closed routers. The testimony in this case was that the Belkin 54G was open in that you plug it in and you go. You don't have to take any step to secure it. But when you say open, you mean that they would have had to take an affirmative step in order to password protect it? Correct. And a closed system would be one that comes, that requires you to put in a password unless you override it. Correct. I see. That was, I guess that's the answer to the question I asked about what he meant by open. I got it. Yes. And so the reason I think that all of this talk about what steps Mr. Arndt may have been taking to share, the reason it matters in the government's theory, and certainly from the district court's point of view, was that the government and the district court were seeing him taking affirmative steps to offer this material to the world. But none of that evidence is in the record. And do we have it in the record that the Belkin comes, as it were, open, and that the default setting for the Belkin is open unless affirmative steps are taken to password protect? Do we know that? Yes. How do we know that? The testimony of Robert Young, who was the expert called on behalf of Mr. Arndt, he had the actual quick installation guide from that particular model, as opposed to the general and longer 115-page owner's manual that came with the CD. Okay? Thank you. Thank both sides for helpful arguments. I somehow have a feeling that teenagers would be better suited to decide this case. The United States versus Arndt, submitted for decision. Thank you. Thank you.
judges: Fletcher, Fisher, Bybee